IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2025

## IN RE KATALEYA F.

**Appeal from the Circuit Court for Sevier County**
**No. 23-TM-14-III   Jeffrey D. Rader, Judge**

_____

**No. E2024-01614-COA-R3-PT**

_____

This appeal involves a petition to terminate the parental rights of a father to his young daughter. The trial court found that the ground of failure to manifest an ability or willingness to assume custody of the child had been proven by clear and convincing evidence and that termination of parental rights was in the best interest of the child. The father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II and JEFFREY USMAN, JJ., joined.

Jeffrey T. Davidson, Rutledge, Tennessee, for the appellant, Kurron M.

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Rebecca D. Slone, Dandridge, Tennessee, for appellees, Russell W. and Ashley W.

### OPINION[1]

#### I.    FACTS & PROCEDURAL HISTORY

This appeal involves a termination of parental rights. The child at issue, Kataleya F., was born in July 2021. The day after Kataleya's birth, the Tennessee Department of Children's Services ("DCS") received a referral alleging that she had been exposed to drugs by her mother ("Mother"). Kataleya was subsequently tested for the presence of drugs,

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' last names to protect their identities.

and the test demonstrated positive results for the presence of amphetamine, methamphetamine, and THC. On July 20, 2021, DCS filed a petition for temporary legal custody of the child in the Juvenile Court of Grainger County, Tennessee, alleging that the child was dependent and neglected and severely abused. The petition stated that Mother admitted having used drugs during her pregnancy, including having "'tried ice', clarified to be methamphetamine, around four weeks prior to Kataleya's birth." The petition stated that Mother had reported that her husband was not Kataleya's biological father. According to the petition, Mother identified Kurron M. ("Father") as the biological father and stated he was incarcerated in Ohio at the time of Kataleya's birth. The juvenile court entered a protective custody order that same day, placing the child in DCS custody and appointing a guardian ad litem. Kataleya was placed with foster parents ("Foster Father" and "Foster Mother") when she was thirteen days old. She was adjudicated dependent and neglected on January 25, 2022.

Father's paternity was subsequently confirmed by DNA testing.[2] He was still incarcerated at a correctional facility in Ohio. Father's mother ("Grandmother") filed a motion to intervene and a petition for custody of Kataleya on January 10, 2023.

On January 26, 2023, DCS filed a petition to terminate the parental rights of both Father and Mother in the Juvenile Court of Grainger County, Tennessee. The petition alleged three grounds for termination against Mother and the ground of failure to manifest a willingness and ability to personally assume legal and physical custody or financial responsibility against Father. *See* Tenn. Code Ann. § 36-1-113(g)(14). The petition also asserted that termination would be in Kataleya's best interest. Subsequently, the foster parents filed a separate "Petition for Termination of Parental Rights and Adoption" in the Circuit Court for Sevier County, Tennessee. The petition named Father, Mother, Grandmother, and DCS as parties. Later, an order was entered that transferred the DCS petition to the Circuit Court for Sevier County, Tennessee, and the matters were consolidated by order entered on July 27, 2023.

Shortly thereafter, Mother surrendered her parental rights to Kataleya. Litigation proceeded, but on April 3, 2024, the foster parents filed a motion to voluntarily dismiss their termination petition as to Grandmother only, stating she had no right to custody or guardianship of Kataleya. An order of dismissal was entered April 16, 2024.[3] However, the proceedings against Father continued. Eventually, the trial was set for August 2024, but shortly before, Father surrendered his parental rights to Kataleya. He timely revoked this surrender on August 5, 2024. The matter proceeded to trial on August 26, 2024. Kataleya was three years old by the time of trial.

---

[2] DCS established contact with Mother's husband. He later sent a notarized letter in which he denied paternity and waived any rights he may have had to the child.

[3] Grandmother subsequently filed a new motion to intervene, which was denied by order entered June 5, 2024.

Father testified first. He explained that he was incarcerated for felonious assault and was scheduled for release in November 2027, but was hoping to be released on parole during the summer of 2025. Father later testified regarding the events leading to his incarceration. The incident involved Mother, a man, a woman, and the man's stepdaughter. An altercation took place during which Father shot the stepdaughter in the chest. He was convicted of felonious assault despite a claim of self-defense, and sentenced to a minimum of seven years in prison. He claimed that he learned Mother was pregnant approximately two weeks after his incarceration began. Father was asked whether he had ever taken any steps to help provide for Kataleya and stated only that he had instructed Grandmother to "see how she was doing" or "if they need[ed] anything." He stated that he wanted Grandmother to have custody of Kataleya until his release.

Next, Father described several programs that he had completed while in prison. He claimed these programs demonstrated that he was "trying to make a change" and had helped him prepare to care for Kataleya. Father was also asked about his employment history. He stated that he had worked in the prison laundry room while incarcerated and was making approximately $25 per month. Prior to his incarceration, Father worked as a butcher for approximately two months. Prior to that, he had worked "seasonal jobs." Father was also asked about his plans upon release. He explained that he intended to move to North Carolina where he would live with his grandfather. He stated that he intended to seek employment in construction and had spoken to a flooring company, which stated it would hire him upon release. Later, he expressed an interest in attending a welding program.

On cross-examination, Father admitted that he had never met Kataleya and was a stranger to her. Father was then asked whether any of the programs he had completed in prison had pertained to parenting. He claimed that he had completed a fatherhood class approximately eight months prior to trial but noted he had not mentioned this class in his earlier testimony. He did not have a certificate of completion for this class as he did for the other courses, but he claimed he was waiting for one to be sent to him. When asked what he learned in this class, Father testified that he learned "[h]ow to be there emotionally" and "how we act when we are around children." When asked what this meant to him, Father stated it meant "[j]ust support and . . . support her, you know . . . through anything that she goes through" and "[h]elp her build her confidence up." He admitted that he did not learn anything specific to Kataleya's age group or her special needs. Father was then asked whether he knew what Kataleya had been through medically and developmentally. He responded that he did initially, but had stopped receiving updates when the petition to terminate his rights was filed. He affirmed that he asked Grandmother to take care of Kataleya, but was not aware of Grandmother having sent Kataleya any gifts or cards. Father stated that he had not written her any letters. Father claimed that he did not know he was allowed to write Kataleya letters, although he admitted he had never asked. Father also discussed a Child and Family Team Meeting ("CFTM") that he telephonically

attended in September 2023 and claimed he was told by the guardian ad litem and the foster family that he could not have any communication with Kataleya.

Although Father recognized that he would not be able to take care of Kataleya until his release from prison, he maintained that he could be there emotionally and that she could visit him. Father acknowledged that Kataleya would be six years old if he was able to obtain custody of her when he was granted parole. He was asked whether it would be a "good idea" to place a six-year-old with "a complete stranger." Father indicated that this would be a good idea and stated they would "get to know each other." He also stated that, if she resided with Grandmother until his release, she would get to know him then as well. However, he did acknowledge that things would not be "peaches and cream" in the beginning of this arrangement. Father was asked whether he was "willing to put [Kataleya] through additional trauma of being ripped out of [her] … only family and only home" in order to accomplish this. He responded, "Yeah. I mean, that's. . . that's not her family." Father went on to say that Kataleya's foster parents "took a job and did…and chose to spend…chose to do a job and it was their job to take care of her until the right…parent or…family member is to take Kataleya." He was then asked whether he knew anything about Kataleya's various medical conditions. He admitted that, besides speaking to Grandmother and his attorney, he had neither inquired about these conditions nor what doctors she attended. He was asked whether he had inquired about these conditions during the Child Family Team Meeting and acknowledged that he had not done so. He conceded that he did not know how to care for Kataleya and did not know what she was going through, but maintained that he could learn. When asked if he had tried to learn up to that point, he responded that he had done so by asking Grandmother, but admitted that he had not asked anyone else about her medical diagnoses. This concluded Father's testimony.

The next witness to testify was Ms. Emileah Buffalo, a Foster Care Case Manager working for DCS. She had been Kataleya's case worker for about one year at the time of trial. Ms. Buffalo explained the circumstances that led to Kataleya being taken into DCS custody and that she had been living with her foster parents for three years. Ms. Buffalo stated that Kataleya identifies Foster Father and Foster Mother as her parents and is closely bonded with them. Conversely, she stated that Kataleya did not know Father was her biological father. To her knowledge, Kataleya had never spoken to or visited Father, and did not share any bond with him.

Ms. Buffalo was then asked about Father's suggestion that Grandmother be considered as a placement for Kataleya until his release from prison. She explained that an "ICPC" had been conducted regarding Grandmother in June 2022 but was denied "[b]ecause she never had stable housing."[4] Ms. Buffalo indicated that a second ICPC was also denied because Grandmother still lacked stable housing. At this point, Ms. Buffalo

_____

[4] It is evident that Ms. Buffalo was referring to having ordered a home study pursuant to the provisions of the Interstate Compact on the Placement of Children ("ICPC").

- 4 -

was presented an affidavit of reasonable efforts which had been submitted in the case on November 28, 2023. This affidavit indicated that she had contacted Grandmother on September 25, 2023, to discuss placement options for Kataleya, but Grandmother had informed her that she was still having housing issues and could not be a placement at that time.

Ms. Buffalo was then asked about her experiences of seeing children previously exposed to traumatic experiences removed from stable homes to be placed with strangers. She explained that this could often serve as an additional traumatic experience for the child. She asserted that Kataleya would be placed at risk of trauma if she were placed with Grandmother or with Father upon his release. She explained that Kataleya is comfortable in the foster parents' home, whereas Father has not demonstrated that he could provide the same stability. Additionally, Ms. Buffalo noted that Father was not scheduled for release from prison for another three years, and in her opinion, it would not be prudent to leave Kataleya in the foster care system for that additional time. She also stated that, in her opinion, a change in caretakers would have a detrimental effect on Kataleya. This was in large part due to the foster parents having learned how to care for Kataleya's conditions and having developed a schedule to create stability necessary to meet her needs. She noted that Kataleya had created healthy parental attachments to her foster parents. This concluded Ms. Buffalo's testimony.

The trial court also heard testimony from Foster Mother. She stated that Kataleya had lived with her and Foster Father since she was 13 days old. In addition to Kataleya, the couple has a biological daughter who is 14 years old. Foster Mother began by discussing Kataleya's medical conditions. She testified that Kataleya has neonatal abstinence syndrome stemming from drug exposure. She explained that this led Kataleya to have trouble feeding when she was an infant, and several formulas caused her to have allergic reactions. She sneezed constantly and had body tremors. Kataleya also became startled very easily and had problems with "her Moro reflux reflex," which has continued. Foster Mother described certain techniques she and Foster Father learned to help Kataleya when she was struggling with the effects of these conditions, including how to console her and how to tightly swaddle her in order to ensure she would not flail her arms when she became startled. Next, Foster Mother stated that Kataleya had been diagnosed with "sensory processing disorder" which affects her ability to control her emotions because she gets overwhelmed very easily. She indicated that this can be triggered by things such as the types of fabric Kataleya wears. Foster Mother stated that, when she was younger, Kataleya would do things such as cry and bite due to this condition. However, it now results in her crying or lashing out or experiencing what she termed a "meltdown," which makes her so physically overwhelmed that she loses the ability to reason. Foster Mother explained that she and Foster Father have learned how to help alleviate these meltdowns. They do things such as applying physical pressure by holding Kataleya in certain ways and speaking to her in a way that provides her with choices "so that she feels like she is in a little bit of control of the situation." They also have a basement in their home dedicated to

sensory toys and items for Kataleya to stay consistent with her therapist's recommendations. Foster Mother stated that Kataleya did not learn to crawl properly as an infant, and this has required physical therapy in order to help her learn and develop. Additionally, she has a condition called submucous cleft palate. Foster Mother explained that this is an opening inside her mouth, which causes various issues with mucus and vomiting and required physical therapy to teach her how to drink from a straw. Foster Mother also stated that Kataleya had her tonsils and adenoids removed. She also has a diagnosis of microcephaly, which led to chronic ear infections.

Foster Mother was asked about the "Grow With Me Clinic" Kataleya attends. She stated that Kataleya began attending appointments at the clinic immediately after she came home from the hospital. Kataleya goes to the clinic every three to six months and sees eight different specialists. Foster Mother stated that, on average, the appointments last between two and four hours. Foster Mother described the appointments as very "thorough" and stated they provide exercises to help Kataleya crawl and control her emotions in settings that account for her sensory needs. In addition to the "Grow With Me Clinic," Kataleya has attended the Tennessee Early Intervention Specialists Clinic since birth. Foster Mother testified that, for the first year of her life, Kataleya saw a specialist at this clinic every week to do developmental therapy at which "she did really well." She further stated that they now have appointments with this clinic monthly rather than weekly, and Kataleya has made great progress in the clinic's program. Shortly after Kataleya turned three years old, she underwent an assessment, which demonstrated that she had progressed from beginning the program "with a forty percent (40%) delay" and "graduated" in the ninetieth percentile. Kataleya also sees a pediatrician at the Summitt Medical Group. This group helps her to manage other conditions such as reactive airway disease. This condition makes it easier for a simple sickness, such as a cold, to develop into pneumonia or bronchiectasis. Foster Mother stated that Kataleya also has allergies to things such as peanuts and protein milk, suffers from eczema, and has gastro-intestinal issues that require her to see a specialist at Vanderbilt University Medical Center.

Foster Mother stated that, during the first year of Kataleya's life, she and Foster Father missed a combined total of 90 days of work in order to make sure she attended all of her appointments. However, Foster Mother explained that Kataleya has improved significantly over the years and "is a little miracle." For the majority of her life, Kataleya had an average of three doctors' appointments per week, but at the time of trial she was averaging only one appointment per week. Foster Mother was asked how Kataleya refers to her, and she answered "Mom" or "Momma." She also stated that she loves Kataleya and views her as her child.

Next, Foster Mother was asked about Father's request that Kataleya be placed with Grandmother until his release. She described her interactions with Grandmother and stated that they met shortly after Kataleya had been placed into DCS custody and communicated afterward. She scheduled weekly phone calls with Grandmother and permitted her to pick

the dates and times of those calls. However, when she and Kataleya called her the first time, Grandmother was asleep. After finally contacting her, they only spoke for a few minutes. Foster Mother stated that, despite being permitted to choose the times of the calls, Grandmother would ask to change the time or would call after the appointed time when Kataleya had gone to bed. Foster Mother explained that, with all of Kataleya's appointments, it was difficult to accommodate Grandmother's changing preferences and eventually the calls stopped. She testified that only three phone calls successfully took place.

Additionally, Foster Mother contended that DCS provided Grandmother with information on all of Kataleya's specialists and she was invited to attend therapies in order to learn Kataleya's needs. However, she never attended any of these sessions. Foster Mother testified that Grandmother had visited Kataleya four times, the last of which was two years before the trial. She also stated that grandmother never visited the child without Mother also being present. Foster Mother asserted that, after these visits, Kataleya would be very upset and scratch her head until she began to bleed or would have nightmares. She stated that Kataleya did not know Mother or Grandmother, and the visits were very traumatic for her. Foster Mother claimed that the visits made Kataleya very upset, she cried until she was sick, her diapers were not changed, and she was fed inappropriate foods which could have caused her to choke due to her medical conditions. She also stated that, despite having advised Mother and Grandmother of Kataleya's allergy to red foods, when she returned, Kataleya had skin irritation consistent with having been exposed to those foods. The stains on her clothing were also consistent with her having been fed those foods. She stated that Grandmother had never sent Kataleya any Christmas gifts, birthday gifts, cards, or letters.

Foster Mother also discussed Kataleya's difficulties adjusting to change and new situations. She explained that Kataleya is very cautious when she meets people. She described a great deal of difference between her behavior at home and in public because home is her safe space where she feels protected and feels she can be herself. Conversely, when Kataleya is in public, even in places like church, where she feels safe, she will hide behind Foster Mother until she is given assurance that the people she is meeting are friends. Kataleya also reacts poorly when separated from her foster parents. Foster Mother described one situation in which she and Foster Father were required to take their biological daughter to a doctor's appointment while Kataleya stayed with Foster Mother's mother, with whom she has a good relationship. Kataleya was very concerned about the whereabouts of her foster parents and continuously asked if they were going to come back for her. She stated that Kataleya has a fear of being left.

Foster Mother was also asked about the September 2023 CFTM. She recounted Father asking why Kataleya could not visit him, and it being explained that this would not be in her best interest. She stated he never asked any additional questions and nothing about Kataleya's diagnoses or how to treat them. She testified that, toward the end of the

call, Father was given a chance to make any other statements or ask questions. He said only something about his parole status upon release from prison. This concluded Foster Mother's testimony.

Next, Mother testified.[5] She was asked why she had surrendered her parental rights to Kataleya and stated that she believed it was what was best for her. She was asked whether the foster parents had taken good care of a Kataleya, to which she responded that they had gone "[a]bove and beyond" in doing so. She was also asked about her interactions with Father and Grandmother after learning of her pregnancy. They neither provided any support nor attended any medical or prenatal appointments. She claimed that they had been in some contact at the beginning of her pregnancy but later she cut off contact with them due to "stress and . . . manipulative control" and "ran away" to Tennessee. However, Mother also testified that Father had never been violent toward her. She next discussed her visits with Kataleya and acknowledged that the visits were "very traumatizing for [Kataleya]." She stated that she did not believe it would be in Kataleya's best interest for Father to remain in her life and averred that the foster parents were the best placement as they knew her and her health conditions "inside and out." She also expressed her opinion that if Kataleya were removed from her current placement, it would be detrimental to her physically, mentally, and emotionally.

Grandmother was the final witness to testify. She was initially asked what actions she took when she learned Kataleya had been born. She stated that the attorney representing Father in his criminal case told her not to contact Mother prior to trial so she "couldn't do anything." However, she indicated that, during the DCS proceeding, she expressed her desire to have Kataleya placed with her. She contended that a DCS worker had indicated that this would be a possibility, but this never came to fruition because the DCS workers managing the case kept changing and there "was just a lot of confusion." After some time, Grandmother retained counsel and filed a petition seeking custody of Kataleya.

Grandmother was asked about her living situation. She testified that she was living in Charlotte, North Carolina and had been there since December 2023. She submitted pictures of the home, which depicted a very suitable residence. However, she explained that she resides with, and the home belongs to, her cousin. She maintained that her cousin was aware she was seeking custody of Kataleya and would permit her to live there as well. She also noted that she is not required to pay rent. Later, on cross-examination, she explained that she had moved many times due to multiple evictions. She acknowledged that several judgments had been entered against her concerning rent owed to previous landlords, as well as one pertaining to a vehicle that had been voluntarily repossessed. She

---

[5] As previously stated, Mother's parental rights are not the subject of this opinion. Therefore, we include only those portions of her testimony that are relevant to the alleged grounds for termination of Father's parental rights.

did allege that one eviction was the result of money being stolen from her. Regardless, she acknowledged that stable housing had been an issue.

Grandmother was also asked about Kataleya's medical conditions. She stated that she knew Kataleya had some conditions, but did not explain them in any detail. When asked how she would care for these issues, she stated that she would do so "[j]ust by taking her to the doctor and making sure she gets to her appointments that she needs." She conceded that she and Kataleya did not know one another very well but indicated that she loved her and would get to know her. However, she later admitted on cross-examination that she had never visited Kataleya on her birthdays or at Christmas, and had never sent her any gifts. Grandmother was asked why she had attempted to file for custody. She responded that it was because she loved her and "she needs to be with her family." She acknowledged that the foster parents had raised Kataleya since birth, but maintained that she did not consider them her family.

The trial court entered its final order on September 25, 2024. The court determined that DCS had proven the ground of failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child by clear and convincing evidence. The trial court noted that several facts supported this ground including: (1) Father's incarceration, (2) Father and Kataleya having never met, (3) Father having purportedly taken only one parenting class, which he could not document or speak on when questioned, (4) Father's lack of knowledge and understanding of Kataleya's medical diagnoses, (5) Father's plan to place the child with Grandmother until his release despite her history of housing instability, and (6) Father's inability to support Kataleya as evidenced by his lack of his support in the past and continuing incarceration. The trial court also determined that placing Kataleya in Father's and/or Grandmother's custody would pose a risk of substantial harm to her "both physically and psychologically." The trial court noted that Kataleya's foster family is the only family she has ever known and opined that Father's plan to remove her from this home to be placed with a stranger would traumatize her. The trial court also noted that a substantial risk of physical harm would be created by Grandmother and/or Father assuming care for those issues where they have no understanding or experience close to that of the foster parents. The trial court also assessed the best interest factors contained in Tennessee Code Annotated section 36-1-113(i) and determined that the factors weighed in favor of termination. Accordingly, the trial court granted the petition to terminate Father's parental rights to Kataleya. Father filed this appeal.

## II. ISSUES PRESENTED

Father presents the following issues for review on appeal, which we have slightly reframed:

1. Whether the trial court erred in finding the ground of failure to manifest an ability

and willingness to assume custody, pursuant to Tenn. Code Ann. § 36-1-113(g)(14), was proven by clear and convincing evidence.

2. Whether the trial court erred in finding that termination of Father's parental rights to be in the best interest of Kataleya by a clear and convincing standard pursuant to Tenn. Code Ann. § 36-1-113(i).

For the following reasons, we affirm the termination of parental rights.

### III.    STANDARDS APPLICABLE TO TERMINATION CASES

"'A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016)). "Parental rights have been described as 'far more precious than any property right.'" *Id.* (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in child's best interest pursuant to the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

We review a court's factual findings *de novo* in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 523-24. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* at 524

(citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review *de novo* with no presumption of correctness" as are any additional questions of law. *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

## A. Grounds for Termination

### 1. *Failure to Manifest an Ability and Willingness to Assume Custody of the Child*

The trial court determined that DCS proved by clear and convincing evidence the ground of failure to manifest an ability and willingness to assume custody of Kataleya. This ground exists where a parent:

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). To prove this ground, the petitioner must prove two "prongs" by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d at 674. The first prong is that "the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[.]" *Id.* This is satisfied by "clear and convincing proof that a parent . . . has failed to manifest *either* ability or willingness[.]" *Id.* at 677. "A parent's ability to assume custody or financial responsibility is evaluated based 'on the parent's lifestyle and circumstances.'" *In re Trenton B.*, No. M2022-00422-COA-R3-PT, 2023 WL 569385, at *6 (Tenn. Ct. App. Jan. 27, 2023) (quoting *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614 at *5 (Tenn. Ct. App. Apr. 9, 2020)). "When evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). The second prong requires proof that "placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

The trial court cited a litany of factors when it determined the evidence "indicate[d] that [Father] ha[d] failed to manifest his ability to assume legal custody and financial responsibility for the child." However, Father asserts that he took several actions manifesting an ability to assume custody. He points to having instructed Grandmother "to check in on Kataleya F. to make sure she was okay" upon learning that Mother was pregnant. He also claims that he "has taken advantage of available programs since he became incarcerated, including a fatherhood class." Father contends that these "steps"

- 11 -

taken during his incarceration have manifested an ability to assume legal custody of Kataleya. Father acknowledges that Kataleya cannot immediately come to live with him as he remains incarcerated, but maintains that Grandmother will be an appropriate placement until he is released as "she has maintained consistent housing since December of 2023." Father does not appear to challenge any of the trial court's factual findings, but rather, merely disagrees with the trial court's determination that the findings constitute clear and convincing evidence this ground has been established.

We begin by noting the effects of Father's incarceration, which renders him unable to take physical custody of Kataleya until at least 2026 if he is granted parole and possibly longer. *See In re Jaydin A.*, No. M2018-02145-COA-R3-PT, 2019 WL 6770494, at \*5 (Tenn. Ct. App. Dec. 12, 2019) (stating that a father lacked "the ability to assume custody or financial responsibility for the child, as [he] [would] not be released from jail for at least nine months"). Although Father notes his proposal for Kataleya to reside with Grandmother until his release, the statute requires examination of whether the parent has manifested the ability "to *personally* assume legal and physical custody or financial responsibility." *See* Tenn. Code Ann. § 36-1-113(g)(14) (emphasis added); *see, e.g., In re Elijah R.*, No. E2020-01520-COA-R3-PT, 2021 WL 2530644, at \*14 (Tenn. Ct. App. June 21, 2021) (noting that a father's argument on appeal regarding items purchased by paternal grandparents "[did] not demonstrate *Father's* willingness to *personally assume financial responsibility* for the child"). Father has not provided a firm plan to provide financially or to establish a home upon release. He stated only that he intended to begin working a construction job or obtain a welding certification and would live with his grandfather. However, most indicative of Father's lack of ability to care for Kataleya is his failure to inform himself of her medical conditions and the treatments necessary to care for those conditions. When asked about them at trial, he stated only that he knew Kataleya had certain medical conditions, but he was unable to explain what those conditions were, how they affected Kataleya, or how they were to be treated. Father also failed to recite any attempts or plans to learn about these conditions or their treatments and did not disclose how his custody plan would permit Kataleya to continue in the medical regime that has aided in her development. Rather, his only statement on the issue was that he would take Kataleya to her doctors' appointments and would "just be there." Father acknowledged that he did not ask for any explanation of Kataleya's conditions when he was given the opportunity to ask questions at the CFTM. Clear and convincing evidence supported the trial court's determination that Father had not manifested an ability to assume custody of Kataleya.

Turning to the substantial harm portion of the analysis, Father states only his "belief that DCS has failed to prove by a clear and convincing standard that placing Kataleya F. in his custody, or in the custody of [Grandmother] until his release, will place Kataleya F. at a risk of substantial harm." Again, however, this argument is misplaced because the termination statute requires us to determine if "placing the child in *the person's* legal and physical custody would pose a risk of substantial harm," referencing Father's custody, not

- 12 -

Grandmother's. *See id.* (emphasis added). The trial court determined that two risks of substantial harm existed. First, the trial court cited Kataleya's medical conditions, and the lengths to which the foster parents had gone to ensure she received proper care. The court noted that Father's assumption of custody and attempted treatment of these conditions posed a risk of substantial harm. Second, the trial court noted that "[t]he foster parents are the only family the young child has ever known" and given that Kataleya has never met Father, she "would simply view him as an unknown stranger and would be very traumatized" if placed in his custody. The trial court determined that these factors demonstrated a substantial risk of both physical and psychological harm to Kataleya. We agree.

First, we consider Father's inability to care for Kataleya's medical conditions as a threat of substantial harm. Foster Mother testified that Kataleya has an average of one appointment per week among three different clinics. She also explained some of the techniques she and Foster Father have learned to alleviate issues caused by Kataleya's medical conditions. Conversely, Father knew nothing of Kataleya's medical conditions. Father also did not explain any plan to learn about these conditions or their treatments prior to his release or assumption of custody, stating only that he had discussed them with Grandmother. Father did not explain whether his grandfather's home in North Carolina would provide access to the child's existing doctors (many of which are specialists) or some similar healthcare provider. Testimony indicated that Kataleya has made substantial progress based on the quality and consistency of the care provided by both her doctors and her foster parents, and it does not appear that Father understands or has attempted to understand the amount of time and energy such treatment requires. Accordingly, we agree with the trial court that there was clear and convincing evidence of a risk of substantial physical harm to Kataleya if she were placed in Father's custody.

Second, the trial court determined that a risk of substantial psychological harm would result from removing Kataleya from the foster parents' care to be placed with Father. Kataleya began living with her foster parents when she was just thirteen days old. She has never lived with anyone else, and testimony indicated that she has formed healthy parental attachments to Foster Mother and Foster Father. Foster Mother also testified regarding Kataleya's interactions with people she does not know. Kataleya will often "hide behind" Foster Mother until she receives reassurance that the persons speaking to her are "friends." Foster Mother also explained that Kataleya has a space in their home that is designed for her needs, and when she is at home, she is much more relaxed and "is herself." Foster Mother testified about the anxiety Kataleya exhibited when being left with Foster Mother's mother on one occasion. Even when placed with someone she loves for one evening, Kataleya was concerned about the whereabouts of the foster parents and wanted to return home. Foster Mother further explained that Kataleya has a fear of being left.

Conversely, Father acknowledged that he is a stranger to Kataleya, and when asked whether this was cause for concern, stated only they would get to know one another.

Further, Kataleya's case manager testified that, in her opinion, removing Kataleya from her home and placing her with Father would result in additional psychological trauma. The copious amounts of evidence on this issue clearly and convincingly demonstrates that a threat of substantial psychological harm would exist if Kataleya were removed from her home with the foster parents to be placed in Father's custody.

Having reviewed the record, the evidence does not preponderate against any of the trial court's findings. Furthermore, the proof in this case amounts to clear and convincing evidence of the ground of failure to manifest an ability to assume custody and financial responsibility pursuant to Tennessee Code Annotated section 36-1-113(g)(14).

### B. Best Interests of the Child

Having determined that the trial court did not err when it found DCS proved a statutory ground for termination existed by clear and convincing evidence, we now consider whether the termination of Father's parental rights was in Kataleya's best interest. The factors to be considered are set out in Tennessee Code Annotated section 36-1-113(i), which states:

(i)(1) In determining whether termination of parental . . . rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

- 14 -

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). Many of these factors are interrelated. Therefore, we address several of them in concert.

First, we consider those interrelated factors concerning Kataleya's need for stability and continuity of placement, the effect a potential change of caretakers and physical environment would have on Kataleya, and her parental attachments and emotionally significant relationships with persons other than parents and caregivers. Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (H), and (I). Kataleya has experienced stability in her foster home. She is treated as a member of the family, is provided for financially, is provided with space and objects intended to meet her sensory and other medical needs, and is taken to all doctors' appointments. She has developed healthy parental attachments to Foster Mother and Foster Father. Foster Mother also indicated that her own mother has formed a bond with Kataleya, who "loves and adores" her. This stands in stark contrast to Kataleya's relationship with Father. Kataleya has neither met Father nor had any other form of contact with him. Although she has met Grandmother on a few occasions, the visits were brief and caused her a great deal of distress. She and Grandmother have not maintained a strong familial relationship. Additionally, much evidence was submitted indicating that removal of Kataleya from her foster family would result in a great deal of distress and trauma. In short, Kataleya has strong bonds with her foster family but no meaningful bond with Father. Therefore, we find that factors (A), (B), (H), and (I) weigh heavily in favor of termination.

Next, we consider the interrelated factors concerning Kataleya's interest in stable and secure housing and parenting. Tenn. Code Ann. § 36-1-113(i)(1)(C), (D), (E), (F), (G), and (O). Father has not demonstrated any continuity or stability in meeting Kataleya's needs. Father was incarcerated prior to Kataleya's birth and has never met her. Father and Kataleya also share no parental or emotional attachment as Father has been incarcerated for her entire life, and he has made no attempt to establish contact with her through letters

- 16 -

or other means of communication. There is no indication that Father has or would be able to cultivate a healthy parental relationship with Kataleya, and we note the difficult circumstances that would arise if Father were to obtain custody and meet Kataleya for the first time when she is six years old. Therefore, we find that factors (C), (D), (E), and (O) weigh in favor of termination. However, although factors (F) and (G) also pertain to Kataleya's interest in a stable home, she has never resided with Father. Therefore, these factors are neutral in this case.

Factors (K) and (L) both concern the reasonable efforts of DCS to assist the parent and the parent's inclination to engage in services offered. Tenn. Code Ann. § 36-1-113(i)(1)(K)-(L). As to factor (K), the evidence demonstrated that Father has completed several programs during his incarceration. Although we commend Father for engaging in these various courses, at best, the vast majority were unrelated to parenting. Father claimed that he had completed a single fatherhood class but was unable to provide any verification of his completion, and he did not list it in his original statement of programs completed. Further, when asked to explain what he learned in this program, he provided only a short and vague description of his experience rather than a concrete and well-explained summary. Thus, even though Father has engaged in several programs, this factor is neutral as it pertains to termination because it does not appear these programs have helped him develop his parenting abilities. As to factor (L), there does not appear to have been a great deal of communication between DCS and Father in this case, largely due to his incarceration in an Ohio facility. Thus, this factor does not weigh in favor of or against termination. As to factor (N), there was no evidence concerning any issues of Father's brutality, physical, sexual, emotional, or psychological abuse toward Kataleya, as he has never had any contact with her. Tenn. Code Ann. § 36-1-113(i)(1)(N). Further, Mother testified that he had never been violent toward her. However, Father is currently incarcerated for having shot someone in the chest. Therefore, factor (N) weighs in favor of termination.

Regarding factor (S), Father does not appear to have made any financial contribution to Kataleya's support. Tenn. Code Ann. § 36-1-113(i)(1)(S). Father was asked what steps he took to provide for Kataleya. He stated only that he instructed Grandmother "to help" and to "see how [Kataleya] was doing" or "if [she and Mother] need[ed] anything." Father made no other statements of having provided any support for Kataleya, and Grandmother testified she had never sent any gifts or cards to her. Father has clearly never provided any consistent and substantial financial support, and this factor weighs in favor of termination.

Finally, we consider the interrelated factors concerning the parent's adjustment of circumstances detrimental to the child's environment, health, and psychosis. Tenn. Code Ann. § 36-1-113(i)(1)(J), (M), (P), (Q), (R) and (T). Father has not adjusted to the circumstances preventing him from caring for Kataleya. He remains incarcerated and although he is hopeful for parole, has not demonstrated the probability of an early release. Additionally, Father has not made any concrete plans for his future upon release. The

extent of his plan is that he will go to live with his grandfather and then will attempt to obtain work on a construction crew or will attend welding school. He has not demonstrated that he has taken steps while incarcerated to prepare to care for Kataleya financially. Additionally, Foster Mother testified to the lengths to which she and Foster Father have gone to seek treatment for Kataleya's needs. Conversely, when asked about Kataleya's medical conditions, Father was unable to explain them in any capacity and demonstrated no knowledge of the requirements for treating those conditions or providing care for Kataleya. He has not indicated that he has any concept of the types of doctors that Kataleya requires or whether similar doctors are located near his grandfather's home in North Carolina. In fact, he has not even demonstrated that he has attempted to learn these things. Finally, concerning Father's emotional maturity, the trial court determined, based on its observation of Father's testimony and his incarceration for felonious assault, that he lacked the maturity necessary to raise a child. We agree. Therefore, factors (J), (M), (P), (Q), (R), and (T) each weigh in favor of termination of Father's parental rights.

Having carefully reviewed the record, we conclude that the proof does not preponderate against the trial court's factual findings, and we conclude that the facts, viewed as a whole, amount to clear and convincing evidence that termination of parental rights is in the best interest of Kataleya. *See In re Neveah M.*, 614 S.W.3d at 680. Therefore, the ruling of the trial court is affirmed.

## V. CONCLUSION

For the aforementioned reasons, the decision of the Circuit Court is affirmed. Costs of this appeal are taxed to the appellant, Kurron M., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE